All right, Mr. Lindemann, if you're ready, we'll be glad to hear from you. Thank you, Your Honor. May it please the Court. My name is Andrew Lindemann along with Jim Parham. We represent the appellants in this matter. You represent all three of the appellants? We represent all three of the appellants, yes, Your Honor. Let me ask you something which bothers me a little bit. Is the doctor properly in this case? And as far as I understand it, as far as jurisdictionally, the doctor is in the case as far as I know. I'm not following Your Honor's opinion. Well, I've scoured the record and I can't find any evidence that the doctor violated any constitutional right. Okay, I understand now the gist of your argument. And you conceded the first prong on the opening brief and on your reply brief. And so that pretty well got the doctor locked in, hadn't it? Well, we didn't concede it. We conceded that in order to have appellate jurisdiction in this particular court based upon Mitchell v. Forsyth and the progeny that have come since then, that any type of issue that involves a factual question or a genuine issue of fact and dispute cannot be the basis for an interlocutory appeal before this court. And for that reason, because of those jurisdictional limitations, we have directed our arguments at the second prong of the Qualified Immunity Analysis. I know you've conceded the first prong. I'm looking at page 14 of your brief. The pellants are not appealing to this court's ruling on the first prong of Qualified Immunity Analysis. Quote, there is evidence in the record in light most favorable to the plaintiff from which a reasonable jury could find that these defendants, all three, were deliberately indifferent to the serious medical needs of the plaintiff. Now, where is the evidence against the doctor? Well, obviously, if this court is ready to deal with the first prong on appeal, we certainly do not concede that point. We've conceded that point. You've already waived it. Well, we haven't waived it because it is the issue that Judge Curry in the court below has alleged or has found that there was a genuine issue of material fact and dispute. Now, I agree with Your Honor that I don't believe that there's any evidence of any of the plaintiffs in the court below, many of the defendants in the court below, actually were deliberately indifferent to the plaintiff's clearly established rights. We can't waive that evidence again. We have to take what the judge found. That's correct, and that is why we have focused our appeal in order to comply with the jurisdictional limitations on the second prong of the qualified immunity analysis. What's the difference between hearing a qualified immunity issue on a motion to dismiss as opposed to a summary judgment motion, which you seem to say there's some problem with? Well, this was heard by the court below on a motion for summary judgment, so obviously the record was much more developed. It was not based simply on the pleadings. I want you to explain to me how you get around your waiver of the first prong. Again, on your reply brief at page 5, it bears repeating that the, quote, concession appellants are not appealing a district court's denial of qualified immunity on the first prong. How do you get around that? Well, again, I would ask this court to, I mean, we have appealed clearly on the second prong. The second prong presents solely a legal issue. As a result, this court, we would submit as appellate jurisdiction over that, and based upon the analysis of the second prong, we believe that the three medical personnel, the three defendants, are entitled to qualified immunity. So despite the fact that there was a finding by the lower court that there were genuine issues of material fact that go to the first prong. I have a question. What is the evidence against the doctor? That might be a better question to ask the other side. I don't believe that there is sufficient evidence to go against the doctor. The doctor was a physician who was on call. He was on call statewide on that particular weekend night. He did not actually come to the prison. He did not actually see Mr. Vinson himself. He was relying on information that was relayed to him by the nurses based upon the history that was provided to him. We contend that his actions were appropriate, and of course we also have expert testimony that supports that that's in the record. So I certainly am not conceding, and the only reason why this case is in the posture it's in is based upon the way the lower court addressed it, and in order to bring a proper interlocutory appeal before this court, we have focused on the legal question, and the legal question is the analysis under the second prong of a qualified immunity analysis. You don't want to address the first prong. Well, I'm happy to address the first prong. I think this waiver, which you've got in your brief twice, this waiver claim cannot even be reviewed for plain error. Well, I think it can be probably reviewed for plain error if this court believes it has jurisdiction to decide that issue. Again, what I was trying to really focus is to make certain that we had jurisdiction before this court. In fact, there was a motion to dismiss this appeal on jurisdictional grounds that was filed shortly after it was heard, after it was filed, and as a result, we clearly wanted to focus on the second prong, and again, as I indicated, I think that the appellants are entitled to relief and entitled to qualified immunity on the second prong of the analysis. The second prong does present purely a legal issue. It presents the question as to whether or not there's controlling authority from the United States Supreme Court or from this particular court that would indicate to these medical personnel, or more specifically, objectively reasonable medical personnel in the same position as the appellants, that their conduct as alleged by the plaintiffs, taking the evidence in the light most favorable to the plaintiffs, did not violate clearly established constitutional rights. And of course, we contend that the district court did not do a proper analysis of the second prong of the qualified immunity analysis, and quite frankly, in Judge Curry's order, there's absolutely no discussion of the second prong. She did adopt the report recommendation of the Magistrate Judge, and the Magistrate Judge disposed of the second prong with one conclusory sentence. The only supporting authority cited by the Magistrate Judge was the Estelle v. Gamble case and the Farmer v. Brennan case, both of which are cases that deal with deliberate indifference in a very general sense, deal with the general principles that have developed by the Supreme Court, have nothing to do with the very specific factual scenario that is present in this particular case. And one of the things that has developed in qualified immunity jurisprudence over the years, and the United States Supreme Court has been very specific to target this, and this court has been very specific to target it, is that you must look at the clearly established right, the existence of a clearly established right not in a general sense, which is what the Magistrate Judge did simply by citing Estelle and Farmer, but you must look at it with a high degree of particularity, and I'm citing this court's decision in Edwards v. City of Goldsboro. But just in 2011, one of the most recent Supreme Court cases dealing with qualified immunity, the Ashcroft v. Elkid case, the Supreme Court even cautioned and actually called out the Ninth Circuit in particular. The court said, we have repeatedly told courts, and the Ninth Circuit in particular, not to define clearly established law to a high degree of generality. The court then went on to say, the general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment, is of little help in determining whether the violative nature of particular conduct is clearly established. We have the same circumstance here. Instead of having the Fourth Amendment, we have the Eighth Amendment. What is generalized by the following facts? They knew the intestines were protruding before they placed him in the restraint chair. This is according to Vincent, which obviously Judge Curry accepted as a factual dispute. Number two, they recognized the condition was life-threatening and a medical emergency. And number three, they failed to secure appropriate medical care for hours while Vincent remained tethered to the chair. Under Farmer, don't they get by that generalized Eighth Amendment claim, as you say? I don't think so, Judge Floyd, because what the district court didn't do in this case and what we contend is appropriate to look at the clearly established right in a very specific sense with a high degree of particularity, to use the court's terms, to look at it, applying the decision from Souser v. Katz, to look at it in the specific sense, the specific context of the case. This is not a simple mere delay in medical treatment case. You've got to factor in a number of different circumstances, or what I call in our brief extenuating circumstances, including the fact that Baxter Vincent was an inmate with a long history of self-injurious behavior. He is someone, you've got to look at the history that the department was just dealing with and these particular nurses were just dealing with Baxter Vincent just in the previous week. He had previously been hospitalized about a week before after putting a paper clip and jabbing that into his abdomen. He was referred to Richland Memorial, then was referred to a surgical clinic and made the decision that the paper clip didn't need to be removed. The nurses were dealing with an inmate who was refusing medical care. The first thing he did on the evening of March 7th was he lacerated both his left and right arms and then he refused any type of treatment or medical care for that particular injury. Plus, a week before, when he had also lacerated himself, Nurse Sherman, while she was trying to administer medical care to him, and all of this is undisputed in the record, when she was administering medical care to him, he assaulted her. So you had nurses and medical personnel who had to be concerned about their own personal safety. Are you arguing that if this person, if the inmate has intestines that are exposed as a result of the injury, that whether he's a good inmate or a bad inmate, or he did it or somebody else did it, is a factor we should consider in determining whether or not he's entitled to medical care? I'm not suggesting that his disciplinary history necessitates whether or not you provide somebody medical care or not. Clearly, that's not the case. What I'm suggesting is you've got to consider the dangerousness of the inmate. You've got to consider the nature of the inmate himself. But I don't recall the nurses saying we didn't treat him because we thought he was dangerous. I thought the testimony and looking at it in the light most favorable to the plaintiff is they didn't see it. They didn't see that his intestines were exposed. Well, what I'm addressing is taking it in the light most favorable to the plaintiff. Their contention is the evisceration was already prominent and noticeable at 1030 at night. To the nurses. To the nurses, and that was prior to placing him into the restraint chair, and that's the key issue at least as far as the district court is concerned. But when that occurred, it was still several more hours, and they saw the intestines protruding when they had him in the chair. Well, the issue that I'm getting to is that they're extenuating circumstances that would justify putting him in the chair, and that's some of the things that I was just outlining. There's also obviously a major consideration that this is a self-injurious inmate. He was a known cutter. He was part of the behavior management program, which was designed to address cutters. That's why he was at Broad River because that's where that program was. And so part of putting him in a restraint chair was, of course, it was twofold. It was, number one, to stop his self-injurious behavior, and number two, in order to provide protection to the medical personnel so that they could then administer treatment. The facts of this case are that even though he was actually restrained, he had a razor hidden in his mouth that he dropped into his lap, and that's what he used to then cut open his abdomen at approximately 1030. So, of course, the medical personnel don't know whether he's got any other weapons, whether he still has that razor blade where he can get access to it. So what we're suggesting is for objectively reasonable medical personnel, which is the way we look at this under qualified immunity in the second prong in particular, you have to look at whether or not it was reasonable to put him in a restraint chair. And it would be, number one, for self-protection for him, and number two, to provide safety for the medical personnel so that they could then treat him. And if the court has seen the videotape of this incident, you will notice immediately after he is restrained in the chair, the nurses are able to administer care to him. And I would submit to the court that the care that was submitted, the plaintiff's own expert, Dr. Nguyen, testified that that was appropriate, the dressing that was placed on the open wound in the abdomen. So, again, the point of the second prong analysis is you can't just look at this in a generalized sense like the district court could or did. You have to look at the specific circumstances. You have to look at it within the factual scenario that's presented. This is not a run-of-the-mill delay of medical treatment case. This case involves numerous extenuating circumstances. And for that reason, we contend that qualified immunity should have been granted to these medical personnel. Thank you, Mr. Lindeman. You've got some time reserved in reply. Mr. Moore. May it please the court. Mr. Moore, let me start with you. How did it affect your case to have a doctor in this case? Well, the doctor who was at the time a licensed physician was on call for the entire state of South Carolina. I understand all that. Just tell me what is the evidence of the violation of the plaintiff's constitutional rights. What is the evidence of that in this record? The evidence, as the district court viewed it, was that Dr. Walsh, viewed in a light most favorable to Mr. Vinson, was aware that he had a protruding intestine, that he recognized that this was a potentially life-threatening medical emergency. When did the doctor first learn that? That's in dispute, but as early as 1230 p.m. That's not the way I read the record. I know that the doctor authorized placing Mr. Vinson in the chair. He was not told at that time that there was any protrusion of the intestines. And later, when the nurses discovered that, reportedly, they immediately called the doctor. And the doctor immediately said, take him to the hospital. Now, have I left out anything? Yes, Your Honor. That's in dispute what the nurses actually told Dr. Walsh. He testified that he was not aware of a protruding intestine when he was first contacted. However, he was aware of an eviscerated bowel, which can be, as he testified, a life-threatening medical emergency that requires— For the purposes of our argument, I think they're one and the same because I don't think the doctor had any knowledge from this record about that but one time. And when he was advised of that, he immediately told them to take him to the hospital. Yes, Your Honor. If we concede that he did not know of the protruding intestine, he at least knew that he had a bowel evisceration and knew that he had a history of mental illness. And instead of sending him to the hospital, which is a life-threatening medical emergency, he testified he acknowledged that it could be, he ordered that Baxter Vinson be placed in a non-sterile five-point correctional restraint chair for eight hours for behavioral reasons. Was he aware at that time of the protruding bowel or the eviscerated intestine? Was he aware of that at the time he told the nurses to put him in the restricted chair? He testified that he was aware of a bowel evisceration. When? As soon as the nurses contacted him. They informed him that there was a bowel evisceration. He testified that he believed it was superficial. He testified that a bowel evisceration can be a life-threatening medical emergency that requires immediate medical attention. And despite his knowledge, instead of sending him to the hospital, he ordered that Mr. Vinson be placed in this non-sterile correctional restraint chair for eight hours. Is that in his testimony in a deposition or what? That's in his testimony that he was aware of a bowel evisceration. Well, I'm aware of that, but the question is when was he aware of it? Anyway, what does it add to your case to have the doctor in it? Well, Your Honor, I'm going to be just covering the jurisdiction argument today, but it adds a lot because he is the one who authorized the other appellants, the two registered nurses, to place Mr. Vinson in a correctional restraint chair. They had contacted him for guidance. Is that the focal point of your argument that the doctor should be liable because he authorized the nurses to place him in a restricted chair? Yes. It's part of our argument. We think that all three of the appellants are responsible, but Dr. Walls, who, again, was aware of an eviscerated bowel and ordered that an inmate like Mr. Vinson, with the history that he had, to be placed in a correctional restraint chair, non-medical, for eight hours for behavioral reasons, is a big part of our case. That is our case against Dr. Walls. However, we assert that this case is not properly before this court. The Fourth Circuit Court of Appeals, the United States Supreme Court, has repeatedly ruled that in order for a denial of summary judgment based on qualified immunity to be appealable, the appellants must concede to the facts as the district court viewed them. Here, Mr. Lindemann and the appellants are arguing a laundry list of extenuating circumstances that this court must consider before they are able to determine whether or not qualified immunity is available. We understand that we can't weigh the evidence, so what's wrong at the summary judgment stage with an interlocutory appeal assuming we don't weigh the evidence? If you don't weigh the evidence and you accept the plaintiff's version of the facts as being true for the purpose of this appeal, and are able to parcel out an issue of law from this appeal, then this court definitely has jurisdiction to entertain that issue of law. However, we believe that the appellants in their appeal have mixed questions of fact with questions of law, which is not a proper interlocutory appeal. By asking this court to consider these extenuating circumstances, these extenuating circumstances are all contradictory. It's contradictory that he had a weapon, that he was a threat of harm to himself, and he was a threat of harm to the nursing staff. It's a highly disputed fact that the delay in medicals... You dispute that he was a threat to harming himself? By the time that the nurses and the doctor, or just the nurses had found him, there was no evidence that he was going to continue to do anything else. He just needed to go to the hospital. Was it more because he had used up all the razor blades he had? Yes, Your Honor. There was nothing else for him to use. He was in a crisis intervention cell where he should not have had access to these items in the first place. But the issue of him being a threat of harm to others is a highly contested fact. And the lower court considered all of these facts when they ruled in a light most favorable to the plaintiff that there was a constitutional violation. And so, yes, under the Winfield case, under the IKO case, if this court makes the determination to parcel out the question of law and apply it to the facts as the district court viewed them, there would be jurisdiction. But the appellants here are not asking to do that. And the appellate jurisdiction is very limited. The Supreme Court has been very clear that in order to burden this court with a midstream appeal, certain requirements must be met. And the appellants have not met that requirement of isolating an issue of law for this court to consider. And unless this court has any further questions. It is that even if you take all of the testimony and evidence and you view it in a light most favorable to the plaintiff, the law is still not clearly established that constitutional right was violated when they took the actions they did or didn't take action. Right, and Mr. Evans is going to be arguing qualified immunity. He's going to address that issue. But in order for this appeal to be properly before this court, yes. The facts must be considered in a light most favorable to the appellate. And the court must accept the facts as the district court viewed them. In fact, there's case law out there that says the court must accept the facts as the plaintiff presented them, unless in those unusual circumstances when the allegations clearly contradict with the evidence. In the IKO case, for example, when there was a video that contradicted some of the plaintiff's testimony. But here we have a video that only supports our allegations. Unless the court has any more questions for me, I'm going to ask Mr. Evans to address the remaining issue of qualified immunity.  May it please the court. Again, the appellants in this case have made this an issue of extenuating circumstances, which takes this out of the case being about a simple delay in medical treatment. However, the record as presented to the district court makes it clear that this is exactly just that. This is a delay in medical treatment case. In fact, a six-hour delay while Mr. Vincent's intestines were spilling out into his lap. He was left by himself for two hours in a cell where he still had access to razor blades, if one still existed at that point in time. Again, that's a contested issue. Mr. Vincent's testimony was that he placed the razor blade into his abdominal wall past his intestines and no longer had access to it. Correctional staff and medical staff could never locate the razor blade, either in trauma surgery or in cleaning out the institution. Again, after the two hours being left alone in the cell, Mr. Vincent was forcibly placed into a restraint chair for two hours with such force that the ratchet straps visible in the joint appendix caused additional intestines to spill out into his lap. He was left by himself for two hours, removed from the restraint chair, and an additional two hours inexplicably elapses before he's thrown onto the floor of a minivan and driven by correctional staff to the hospital, wherein he is immediately taken into trauma surgery and spends a combination of two months either in the infirmary and in the hospital having multiple procedures to clean this wound out and to put his internal organs back in his body. This is a case that at its heart is a simple delay in medical treatment. It's involving a life-threatening medical condition that all of the appellants have conceded. Had they seen it, they would acknowledge that this is a life-threatening medical condition. There is a clear dispute in the record as to whether or not they saw this issue, or saw this evisceration. The extenuating circumstances that the appellants would like this court to factor into the analysis to determine whether the right was clearly established are all highly controversial. The fact that Mr. Vinson was self-injurious, if only thing, only increases the emergency nature of the situation. The refusal of medical care is something that is highly controversial. If there was any refusal at all, the only refusal was when Mr. Vinson's prior arm wounds were attempted to be glued back together. He said, I don't want you to glue my arms back together, I'd like to see a doctor. In fact, some 14 hours later when he was taken into trauma surgery, his arm wounds required cauterization and stitches. They were still actively bleeding. I believe it was some 10 hours later when he finally made it into trauma surgery. Let's talk about whether or not the law is clearly established. What's your best case? Case closest to this one that would have put the doctor and nurses on notice that their actions or inaction would violate this defendant's constitutional right. Farmer v. Brennan would be our closest case because that is the case that set the failure of a prison official to act in the face of a serious and life-threatening medical condition is a clearly established Eighth Amendment violation. All right, now I hate to cut you off, but as I understand the appellant's argument, it is that the facts in Farmer are so far apart from the facts in this case that it could not be constituted and clearly established of the law that this treatment or lack of treatment was unconstitutional. What's your response to that? Our response to that is that whether or not the facts were on point in that case, the law clearly set a mandate that prison officials are required to respond and to act. They cannot fail to act in a situation where they know of a life-threatening medical condition. Factually, we would contend that the case that would be most on point would be the Supreme Court's decision in Hope v. Pelzer. In that case, an individual of the Supreme Court was appalled at the open and obvious Eighth Amendment violation where an individual was handcuffed to a hitching post for six hours, left without a shirt, thereby exposing him to a sunburn. Here we have an almost identical time period that elapsed. We have an individual that was not only handcuffed to a post, but he was forcibly ratcheted into a restraint device with such force that additional intestines were forced to spill out into his lap, and he was left with his external organs exposed to the outside world. That's going to be a great jury argument. The question we got is on the question of law, what case puts these doctors and nurses on notice? You use the term open and obvious. Is it your position that some treatment or lack of treatment is so open and obvious that it can't help but constitute deliberate indifference to the medical needs of the defendant? It is. In Brasow v. Hagen, the court said, of course, in an obvious case, these standards can clearly establish the answer even without a body of relevant case law. That was then echoed in Hope v. Pelzer in which the Supreme Court found that the treatment of handcuffing this individual to a hitching post was such an open and obvious violation of the Eighth Amendment right to be free from cruel and unusual punishment that no factually relevant precedent was on point. Yeah, but, you know, I think we have a case in our circuit where deputies handcuffed a defendant to a light post and then called the deputies in the adjoining county to come get him and left him handcuffed to the light post, and I believe we said there that there were no constitutional violations. Exactly, Your Honor. Where in that case the defendants were police officers, were custodial staff. In this situation, we have medical personnel who under Farmer are responsible for safeguarding the inmate's right to access to medical care and to access to adequate medical care, and that's the major distinguishing factor between those two situations. Here we have a formerly licensed surgeon, two registered nurses, who all testified that they acknowledge that a bowel evisceration is a life-threatening condition. The only thing they don't acknowledge is whether or not they knew about it at the time, which, again, would be a proper argument under the first prong of the qualified immunity analysis, but that argument can only be made after we have our jury trial in this matter. Under the second prong, the only issue before this court is whether an inmate who has an active medical emergency is entitled to some level of medical care. We contend that the record supports absolutely no medical care was provided to Mr. Vincent. He instead was allowed to remain for six hours with his external organs exposed. Another case that has been cited for the proposition that this is clearly established is the Iko v. Shreve case. That was a case in which an inmate had been doused with pepper spray and was provided with no medical care. The Fourth Circuit, this court, in that case, defined the applicable right as the right to adequate medical care in a very broad sense. In that case, the court said it's clearly established that an individual who has been exposed to contaminants, who is suffering from an emergency, has a right under the Eighth Amendment to adequate medical care. That's a case that, again, would be factually on point. The appellants have attempted to distinguish that case, arguing that, well, that's a case involving correctional defendants rather than medical defendants. If anything, that will make the analysis much more clear because unlike a correctional defendant who may not know the contours of a medical emergency, each and every one of the appellants in this case are medical professionals that knew the risks associated with having your external organs eviscerated. Well, the problem I have with your argument, particularly when you're seeking qualified amenity, you've got a dispute as to the facts. You and the opposing counsel don't agree as to who knew what when and what they did. Now, we can't, as Judge Floyd pointed out, we can't determine what the facts are. And it seems to me that unless you can make a better clearing argument, this is not a case that we can grant qualified amenity in. We contend, Your Honor, that the dispute about the facts, would go to the first prong, and that is something that can only properly be before this court after the case has been tried. I understand that. There's no question about how his condition deteriorated and when the bowels were discovered and so forth. But the question is, when? What did the doctor know? We've already addressed that. But when did the nurses know? The record as set forth by the district court establishes that as early as 1017, the doctors and the nurses knew of a bowel evisceration, if not an actively exposed intestine. The nurses, according to the district court, knew that as early as 1017. And the doctor, at minimum, knew of a perforated abdomen, at least, at most, an eviscerated bowel. Instead of ordering medical treatment or providing medical care, Dr. Walls, according to the joint appendix, ordered Mr. Vinson into the restraint chair for behavioral purposes, not so that he could secure medical treatment but for treatment. I don't think the doctor knew about the eviscerated bowel at that time. The way I read this record, the first time he had knowledge of it was when the nurses told him, and that's when he ordered that Mr. Vinson be transported to the hospital. The doctor acknowledged that he did know about some level of bowel injury as early as the first phone call at 1017. He may have known about the fellow having a razor blade and injuring himself and so forth, but I don't think at that point the eviscerated bowel was that obvious, even to the nurses. Your Honor, it would be opposition that that is a matter that can only be clarified by the jury in this case. I see that my time has expired. Unless the court has any further questions, we yield to the appellants. Thank you, Your Honor. Thank you, Mr. Evans. Mr. Lenderman. Thank you, Your Honor. I think it's very telling that the appellees take the position that the closest case on point is Farmer v. Brennan. I would submit to this court, obviously, Farmer v. Brennan is a very important case in the deliberate indifference jurisprudence because it clarified the definition of deliberate indifference. But it was not a medical case. It was a duty-to-protect case. It was a transsexual who was placed in the general population of the prison, and the issue was whether or not prison officials were deliberately indifferent to the safety of that individual inmate because of its sexual orientation or the fact that the person was a transsexual. What do you say about the Holt case? Well, the Holt case, again, it's not a medical case. And as Chief Judge Strachler pointed out, I mean, this court has the Robles case, which is very, very similar facts to that where qualified immunity was applied by this court. But it's not a medical case. It's a law enforcement case, and what we have here is obviously medical issues. The only parties that are still in this case are the medical personnel. And let me make one other point about the fact that there's no controlling authority. The only other case that is cited, and in fact the only case that was cited in the appellee's brief, is Iko versus Shreve, and we've distinguished that case on a number of accounts, but more so than distinguishing the case, that particular decision didn't come down from this court until August 6, 2008. The events had already occurred in this particular case. The events here were March 7th and 8th of that same year, 2008, but I don't know of any authority that would suggest that an appellate decision post the events could possibly be considered as putting the individuals on notice that their conduct was in violation of constitutional rights. So the simple fact that the Iko case wasn't decided until several months after these events I think shows quite clearly that these particular defendants could not be held responsible for knowing of the existence of that particular decision. What is telling and what is clear is that there is no controlling authority on this particular issue. Do you think there has to be? No, and I would agree that in very, very far-fetched circumstances there does not have to be, and in fact the case I cited earlier from the Supreme Court from 2011, the Ashcroft versus Elkid case, the Supreme Court actually clarified that point, and they said, and I think this is very important, they said we do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. That's the first time they used that language, beyond debate, and I would suggest if you apply that language from the Ashcroft versus Elkid case to this case, the unconstitutionality, as alleged, of the actions of these medical personnel was not beyond debate under the specific circumstances. So when you look at the clearly established right and determine whether it was clearly established with the degree of particularity that's required both by the Supreme Court and this court, and you look at it within the specific factual circumstances as required by the Supreme Court, you apply that beyond debate language, I do not believe, and I respectfully submit to this court, that there is not controlling authority that would have put an objectively reasonable medical personnel, either nurse or doctor, in the positions of these two nurses or Dr. Walls, that their conduct on that particular night violated the plaintiff's constitutional rights. Even if you accept that's true, as we have to in this posture, in the cases in this posture, we assume they saw his bowels, his intestines were exposed, and they put him in the straight chair anyway, and they didn't tell the doctor, and they left him in the straight chair, that it's still debatable as to whether or not they were deliberately different. Yes, under these circumstances. And of course, again, this is not your run-of-the-mill delay case. And I also submit that if you look at the testimony of Dr. Nguyen, who's the plaintiff's medical expert, he describes the delay as three hours. And during that three-hour period, it's not that the plaintiff didn't get any type of medical care. In fact, he got what Dr. Nguyen testified was appropriate medical care, that is, after he was placed in the restraint chair, so it was safe for the nurses to be able to deal with him, that they properly dressed the wound. But he didn't get the same degree of medical care, obviously, that he got once the doctor knew his intestines were exposed. He didn't get transported to the hospital immediately. He didn't receive the treatment that he would get at a hospital. That's correct. But he did receive medical treatment. Now, as this court well knows, there's a difference in the jurisprudence between cases where you get no medical care and you get some medical care and there's a disagreement as to the medical care that's required. Obviously, an Eighth Amendment claim isn't a medical malpractice claim, and I know this court's well aware of that, and deliberate indifference is a very high standard. And so if there's a disagreement as to the level of medical care or believe that different medical care or a higher degree of medical care was required under the circumstances, that is pertinent to a medical malpractice claim, but it's not pertinent to a cruel and unusual punishment claim. And so, again, our position is there needs to be controlling authority in order to satisfy the second prong from either this court or from the Supreme Court that would put an objectively reasonable medical person, such as these nurses or this doctor, on notice that their actions were violating Mr. Vinson's constitutional rights. I could not find any such authority. I don't believe there's any such authority that's been cited in this court. The two cases, Farmer and Estelle, do not provide for that. The IKO case, even if it did, didn't occur, didn't come down from this court until after these events. We submit that this is a clear case where the second prong has been met and ask that the court remand for entry of summary judgment based upon qualified immunity. Thank you. Thank you, Mr. Lenderman. Ladies and gentlemen, normally...
judges: William B. Traxler, Jr., Henry F. Floyd, Clyde H. Hamilton